556 A.2d 230

**Gary George YORKE**

v.

**STATE of Maryland.**

No. 123, Sept. Term, 1988.

Court of Appeals of Maryland.

April 7, 1989.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, BLACKWELL, JJ. and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (Retired) Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

## I

Robin Conner, 15 years of age, asserted that she had been violated. Her allegations resulted in a criminal trial before a jury in the Circuit Court for Baltimore County. The State adduced evidence legally sufficient for the jury to find the corpus delicti of each of first degree rape, first degree sexual offense, kidnapping, and carrying a weapon openly, and the criminal agency of Gary George Yorke. The jury so found and Yorke was duly sentenced. Seeking to overturn the judgments, Yorke pursued to no avail all of the measures then available to him. On direct appeal the

Court of Special Appeals affirmed the judgments. *Yorke v. State*, No. 34, September Term, 1987, unreported, filed 2 October 1987. We denied Yorke's petition and a cross petition by the State seeking our review of the judgment of the intermediate appellate court by way of certiorari. *Yorke v. State*, 311 Md. 386, 535 A.2d 465 (1988). It seemed that the case of *State v. Yorke* had reached the end of the judicial process. It had not.

Four years after the crimes were committed, Yorke filed a motion for a new trial. He claimed that he had discovered new evidence.[1] The evidence, he asserted, showed that he was not the criminal agent. The evidence was discovered through an identification technique known as "DNA Fingerprinting,"[2] which was not available in the United States at

---

1. Maryland Rule 4–331(c) provides, in relevant part:

    The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

    \*     \*     \*     \*     \*     \*

    (2) in the circuit courts, on motion filed within one year after its imposition of sentence or its receipt of a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later. Section (a) of Rule 4–331 requires that a defendant file a motion for a new trial within ten days after a verdict.

    In the case before us, the mandate of the Court of Special Appeals was received by the Circuit Court for Baltimore County on 6 November 1987. Yorke's motion for a new trial on the ground of newly discovered evidence was filed on 11 April 1988.

2. "DNA" is an acronym for dioxyribonucleic acid. Testimony from three highly qualified experts on DNA Fingerprinting was received at the hearing on the motion for a new trial. Each of them testified in unequivocal terms that the technique is universally accepted as reliable in the relevant scientific community.

    One of the experts was Dr. Daniel Garner, a chemist and the Laboratory Director of Cellmark Diagnostics. Cellmark Diagnostics is a "Clinical Laboratory." It is licensed by the State of Maryland in "the area of immunohematology and molecular biology," and to use radioactive material, "specifically for P32, AS35 radioisotopes." It holds a license by Montgomery County for hazardous chemicals and a federal "clinical laboratory improvement license," a license for interstate transportation of biological materials, and the usual licenses for "alcohol" and other substances.

the time of his trial. The motion was denied upon a plenary hearing in the Circuit Court for Baltimore County. Yorke appealed. We ordered the issuance of a writ of certiorari on our own motion before decision by the Court of Special Appeals.

## II

### (A)

That a new trial may be granted in a criminal case tried to a jury is undoubted. The existence of the power is recognized in Md.Code (1987 Repl.Vol.) Art. 27, § 594, and in Md.Rule 4–331 and its predecessor rules. It was a power that existed at common law, at least as to misdemeanor cases, although not as to felonies. As long ago as 1859 it seemed well-settled that Maryland courts could

---

Dr. Garner explained the operation of the technique. We set out his testimony as it is summarized in Yorke's brief.

DNA is the basic genetic material that exists in the chromosomes of the nuclei of the cells of virtually every type of human tissue with the exception of red blood cells. DNA material can be chemically extracted from human tissues such as blood, hair, and semen. The typical DNA substance extracted consists of approximately three billion units. Through various modern techniques, it is possible to cut down this substance into fragments small enough to be handled and examined in a laboratory. The technique of fragmentation and fragment collection is known as electropheresis, during which the DNA material is placed in a gel that functions as a sieve when an electric current is applied to it.

Through the use of a technique whereby the DNA fragments are stretched onto a nylon membrane, it is possible to apply to those fragments radioactive "probes" which are themselves comprised of DNA material. These probes are drawn to "complementary" components of the DNA fragments. The probes in travelling to the specific components form a pattern. This pattern is reproduced by laying the nylon material onto X-ray film. The radioactivity of the probes causes the film to develop, thereby permitting visual analysis of the particular DNA fragment.

Within each fragment of DNA appear repeating unit patterns, which have been found to be unique to each individual. In this way, the DNA of one individual can be differentiated from that of another, even if both individuals have deposited samples which have become mixed or intertwined.

grant new trials after convictions. *See Ford v. State,* 12 Md. 514 (1859).

*In re Petition for a Writ of Prohibition,* 312 Md. 280, 308, 539 A.2d 664 (1988) (footnote omitted). In that case, Judge Adkins, speaking for a unanimous Court, discussed the power to grant a new trial in a criminal cause. *Id.,* 312 Md. at 307–327, 539 A.2d 664. The comprehensive opinion, distinguished by exhaustive research and careful analysis of the law, set out the conclusion that there is a difference, based on the weight of the evidence, between a motion for judgment of acquittal and a motion for a new trial. *Id.* at 325, 539 A.2d 664.

> The former, if granted, results in acquittal and the proper test is sufficiency of the evidence to convict. Weight and credibility are not at issue. The evidence must be read from the viewpoint most favorable to the prosecution and if so read any rational fact-finder would find it sufficient, the motion must be denied. The latter, if granted, results only in a new trial. As a consequence, a court has more latitude in considering it, and may take into account factors such as credibility.

*Id.* The decision "gives limited authority to a trial judge to set aside a verdict that is against the weight of the evidence." *Id.* at 326, 539 A.2d 664. We declared that a judge has the "authority to weigh the evidence and to consider the credibility of witnesses in deciding a motion for a new trial." *Id.* In so stating, we overruled *State v. Devers and Webster,* 260 Md. 360, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971),

> to the extent it holds that sufficiency of the evidence is the standard to be applied on a motion for new trial based on the allegation that a verdict is against the evidence or against the weight of the evidence.

*In re Petition for a Writ of Prohibition,* 312 Md. at 326, 539 A.2d 664. We also overruled *Devers*

> to the extent it holds that what is now Article 23 of the Declaration of Rights precludes the broader standard of review we here permit.

*Id.* And we overruled "[a]ny other case, to the extent it so holds...." *Id.*

"To grant or deny a motion for a new trial on the basis that a verdict is against the weight of the evidence is, of course, a discretionary matter."

*Id.* at 327, 539 A.2d 664. We cautioned, however, that our holding was simply that

reviewing weight of the evidence of necessity involves a weighing process, and part of that weighing may implicate consideration of credibility. But a trial judge is not at liberty to set aside a verdict of guilt and to grant a new trial merely because the judge would have reached a result different from that of the jury's. Motions for new trial on the ground of weight of the evidence are not favored and should be granted only in exceptional cases, when the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to let the verdict stand. And in the area of credibility, a reviewing judge ordinarily should not make a credibility determination if there is nothing more than conflicting testimony; there should usually be at minimum substantial impeachment of a witness before the judge finds that witness's testimony deficient on the basis of credibility.

*Id.* at 326–327, 539 A.2d 664.

.

(B)

In the instant case, the teachings of *In re Petition for a Writ of Prohibition* are in the context of a motion for a new trial grounded upon newly discovered evidence. In *Stevenson v. State*, 299 Md. 297, 473 A.2d 450 (1984), we noted that "[w]hether or not the [newly] discovered evidence is material to the [outcome of the case] is ... a threshold question." *Id.* at 302, 473 A.2d 450. We declared: "It should be decided in the affirmative before the court inquires into the possible impact the newly discovered evidence would have on the outcome of the trial." *Id.*

## (1)

Yorke discovered the new evidence in this manner. Shortly after the rape, the victim, Conner, was examined by a physician. Vaginal washings were taken and preserved by refrigeration. When Yorke became aware of the DNA Fingerprinting procedure, he had his DNA pattern compared to the DNA pattern that appeared in the still available vaginal washings of Conner. Evidence adduced at the hearing on the motion for a new trial through the testimony of an expert witness and his written report showed that Yorke's DNA pattern and the DNA pattern in the vaginal washings obtained from Conner did not match. This evidence was admitted without objection; it was not disputed or refuted.

At the close of all the evidence at the hearing, the judge placed his findings on the record. He found that

(1) the defense had "met its burden with respect to persuading [him] that the [DNA] procedure is generally acceptable in the relevant scientific community and is reliable."

(2) the evidence presented by the defense was "newly discovered evidence;" and the defense had "diligently pursued this course of action."

(3) the newly discovered evidence was "not cumulative or impeaching, although it touches upon evidence that was presented."

The State did not challenge the judge's finding that evidence obtained by the DNA Fingerprinting technique was admissible.[3] And the State did not dispute that the evi-

---

**3.** The judge predicted:
  That issue, even if my decision here is appealed, probably won't get decided because it is not an issue anymore once I find that the State is not going to contest that finding. They are going to be using this test probably more than the defense as they get going....
The judge's prediction was realized. *See infra.*
  Although Yorke asks us to decide whether the results of the scientific technique known as "DNA Fingerprinting" [are] admissible in evidence,

dence offered at the hearing was indeed newly discovered. So the question is whether the new evidence was material, and, if so, what impact it would have on the outcome of the trial. The determination of its impact on the outcome of the trial would depend upon the standard applied in reaching the determination.

### (2)

■ The trial judge admitted the newly discovered evidence. As we have seen, he found that "it touches upon evidence that was presented [at the trial]." Inasmuch as he found that it touched upon the evidence presented at the trial, it was "material" to some extent to the outcome of the case. A trial judge has a wide discretion in the conduct of a trial. The exercise of that discretion will not be disturbed unless it has been clearly abused. *Ricks v. State*, 312 Md. 11, 31, 537 A.2d 612, *cert. denied*, —— U.S. ——, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *Smith v. State*, 299 Md. 158, 179, 472 A.2d 988 (1984); *Poole v. State*, 295 Md. 167, 180, 453 A.2d 1218 (1983). "The principle that the overall direction of the trial is within the sound discretion of the trial judge encompasses the admission of evidence." *Crawford v. State*, 285 Md. 431, 451, 404 A.2d 244 (1979), and cases therein cited. We asserted in *State v. Babb*, 258 Md. 547, 550, 267 A.2d 190 (1970), that in a nonjury case:

> [t]he assumed proposition that judges are men of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence, lies at the very core of our judicial system.

we have no need now to reach that question. The State did not challenge the receipt of the evidence at the hearing on the motion for a new trial, and there is no suggestion that the trial court erred in admitting it. The propriety of the admission of the DNA Fingerprinting evidence was not preserved for appellate review, and we see no reason to decide it now. Md.Rules 4–322 and 8–131. Although the evidence adduced at the hearing was impressive on the issue, we prefer that the answer to the question await the time when it is contested, has been fully briefed and argued, and is properly before us.

We find no clear abuse of discretion here in the admission of the DNA evidence.

### (3)

The threshold question of materiality having been satisfied, the next inquiry is the degree of persuasiveness of the new evidence. In other words, could the new evidence affect the outcome of the trial? And that inquiry can only be determined upon a standard by which the effect shall be tested.

### (i)

Cases in other jurisdictions apply essentially the "might" standard or the "probable" standard. Both are rather nebulous. It seems that the most precise definition of the "might" standard appears in *United States v. Wallace*, 528 F.2d 863, 866 n. 3 (4th Cir.1976): "There is more than a faint possibility of a different jury verdict but something less than a probability."

The "probable" standard, however, remains even more esoteric. It is generally referred to with no greater definement than was set out years ago in *Berry v. State*, 10 Ga. 511, 527 (1851), which spoke in terms of the evidence being "so material that it would probably produce a different verdict if a new trial were granted."

Other State and federal courts have spoken in equally general terms. *See,* for example, *Holmes v. United States*, 284 F.2d 716, 719 (4th Cir.1960) (newly discovered evidence must be of such character as is "likely" to lead to an acquittal on a new trial); *State v. Doherty*, 72 Vt. 381, 403, 48 A. 658 (1900) (the evidence must raise a reasonable doubt as to the guilt of the defendant); *United States v. Hedgeman*, 564 F.2d 763, 766 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978) (no reasonable likelihood that the new evidence could have affected the judgment of the jury).

All in all, we are constrained to conclude that the courts generally play by ear with an ad hoc approach whether the

newly discovered evidence calls for a new trial, no matter what words they use to describe the standard alleged to support the decision. It seems that they actually lean on the assertion, which has become a cliché, regarding hardcore pornography made by Justice Stewart, concurring in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964): "I know it when I see it." *See Stevenson v. State*, 299 Md. at 302–303, 473 A.2d 450.

In *Stevenson* we left open the standard to be followed. We said:

> Under the circumstances present in this case we need not decide which standard should apply. . . .

*Id.* at 301, 473 A.2d 450. Our decision not to announce a standard in *Stevenson* was based on our finding that the trial judge did not err in determining that the "materiality" of the newly discovered evidence *was not* demonstrated.[4] Therefore, there was no necessity to consider the impact of the evidence on the verdict. *Id.* at 304, 473 A.2d 450. Here, the necessity arises to adopt a standard because we believe that the trial judge did not err in determining that the "materiality" of the newly discovered evidence *was* demonstrated. Thus, we are led to the next step of reviewing the propriety of the trial judge's holding that the new evidence did not sufficiently touch on the evidence adduced at the trial to affect the outcome. In turn, we are obliged to adopt a standard by which the impact of the evidence on

---

4. In *Stevenson v. State*, 299 Md. 297, 473 A.2d 450 (1984), we observed that

> in essence, the trial judge implicitly concluded that the newly discovered evidence was not material to the outcome of the case

because the evidence otherwise "overwhelmingly pointed to appellant's guilt." Id. at 301–302, 473 A.2d 450.

The evidence as to Yorke's criminal agency was far from overwhelming. The hearing judge recognized that there were significant inconsistencies in the evidence on this issue. The judge pointed out, however, that the jury, exercising its function to weigh the evidence and judge the credibility of the witnesses, resolved the issue against Yorke.

the verdict shall be determined sufficient to warrant a new trial.

Many of the federal courts incline toward the "probable" standard. As we have seen, the state courts tend to flounder, and no uniform pattern emerges from their decisions. Yorke would have us adopt the "might" standard, which he concedes is a minority rule, rather than the "probable" standard, which, he urges, places a severe burden on the defendant. The State, of course, opts for the "probable" standard. The Court of Special Appeals has followed that standard. *See Bloodsworth v. State,* 76 Md.App. 23, 543 A.2d 382, *cert. denied,* 313 Md. 688, 548 A.2d 128 (1988).

■ We appreciate that it is impossible to formulate a litmus type test that would come up with a "yea" or "nay" as to whether the new evidence would change the verdict. We favor, however, a standard that falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable. We think that a workable standard is:

> The newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.

### (ii)

■ At the hearing on the motion for a new trial, the fact that Conner was raped was not questioned. The issue was whether Yorke was the rapist. As we have noted, the newly discovered evidence adduced at the hearing went no further than to establish that

> [t]he DNA Fingerprint from the vaginal washing did not match the DNA Fingerprint from the blood of Gary Yorke.

Report of Laboratory Examination of Cellmark Diagnostics, dated 5 April 1988. The Report noted:

> The possibility exists that the DNA from the vaginal washing is that of the victim.

Cellmark requested "a blood sample from Robin Conner." Cellmark's conclusion as a result of the testing was:

> No conclusion could be reached concerning the origin of the questioned evidence.[5]

At the close of all the evidence at the hearing and argument of counsel having been heard, the judge denied the motion for a new trial. Discussing his ruling, he pointed out:

> The Court of Special Appeals reviewed all of the evidence in this case. As we know, there were other allegations of error but affirmed. All of the evidence that was argued here this morning was the same evidence that the jury had to consider.

He noted: "Yes, there are certain inconsistencies, but there were an awful lot of consistencies." He reviewed in detail the evidence that tended to show that Yorke was the criminal agent, and the discrepancies in Conner's testimony. He suggested that "the jury dealt with all of that." He concluded:

> What it all comes down to is that with all of the given discrepancies and all of the given consistencies the jury said, "He did it."

The judge considered the newly discovered evidence in the light of the evidence that was placed before the jury at the trial on the merits. He asserted that all the new evidence shows is that Yorke "could not have been the depositor of the semen." "So," the judge asked, "what is the other evidence that needs to be compared with all of that plus this new evidence that he could not have deposited the semen?" The judge answered his question: "The other evidence is

---

5. It was brought out at the hearing that hair roots are an appropriate matter for DNA Fingerprinting. Although hair pluckings and hair combings of Conner had been taken at the time of the examination of her shortly after the rape, the Baltimore County Police Department Evidence Unit informed defense counsel that they had been destroyed and were not available at the time of the DNA testing.

Also blood typing could not serve as an investigative tool because Conner and Yorke had the same blood type.

... that she had sexual intercourse with her boyfriend several hours before [the rape]," and shortly thereafter she left the boyfriend's home.[6] The judge said that an important piece of evidence was her testimony: "I don't know whether [the rapist] ejaculated." The short of it is that the judge found that the newly discovered evidence, weighed with the evidence before the jury at the trial on the merits, did not affect the verdict to the extent that the outcome of the trial would be different.

We have now filled in the blank in our cases regarding the standard to be used in assessing the impact of newly discovered evidence on a verdict of guilty. We apply the standard we have adopted in determining whether the trial judge abused his discretion in denying Yorke's motion for a new trial. We cannot say, in the light of our standard, that the new evidence touched on the evidence at the trial to the extent that it "may well have produced a different result." We do not believe that there was "a substantial or significant possibility" that it would do so. As the judge recognized, the new evidence showed no more than that the DNA pattern in the vaginal swabbings of the victim did not match Yorke's DNA pattern. The DNA test results before the court did not even disclose the origin of the DNA pattern which was found in the washings. Conner did not know whether the rapist had ejaculated so that the absence of Yorke's DNA pattern did not exclude him as the criminal agent. We hold that the trial judge did not abuse his discretion in denying the motion for a new trial.[7]

---

**6.** After Conner left her boyfriend's home, she hitchhiked on Reisterstown Road in Pikesville, Maryland. She accepted a ride from a stranger who subsequently committed the crimes of which Yorke was convicted upon her identification and other evidence tending to show that he was the assailant.

**7.** At the time Yorke filed his motion for a new trial, he also filed a motion for appropriate relief, seeking to have further DNA testing to determine the origin of the DNA pattern found in the vaginal swabbings. There followed an extensive colloquy between the judge and counsel. The judge thought that the proceedings were beyond further testing, but finally agreed that further testing could be had by obtain-

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY AFFIRMED;

COSTS TO BE PAID BY APPELLANT.

ing samples from Conner and her boyfriend "under the right condi-
tions." He said: "You are free to do that, but that doesn't change
what I have done now."

This colloquy prompted inquiry by this Court during oral argument.
We asked whether further tests had been made and whether other
motions had been filed. Counsel did not know at the time, but we
have since received a letter from the Assistant Public Defender appear-
ing in behalf of Yorke on appeal, a copy of which was sent to the
Assistant Attorney General representing the State. We are told that
the Assistant Public Defender has

been informed by Mr. Yorke's trial counsel that further testing has
established that the victim was the sole source of the DNA material
recovered from her after the rape. No DNA material in that sample
could be linked with either the victim's boyfriend or any third party,
including of course Mr. Yorke.

This leaves Yorke in the same position as if no DNA tests were made.
The results of the tests do not in any way eliminate or include Yorke
or any third person as Conner's assailant. At most, the tests show no
more than whoever raped Conner, be it Yorke or someone else,
deposited no DNA in her. If this evidence were put before the trial
judge, it would not affect the propriety of his denial of the motion for
a new trial one whit.